**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ALBERT M. CARTER                        *

    Plaintiff                        *

          v                        *                Civil Action No. DKC-16-103

S. WILSON,                        *
G. DURST,
FRENZEL, and                        *
R. RAINES
                                *
    Defendants
                                ***

## <u>MEMORANDUM OPINION</u>

Defendants filed a Motion to Dismiss or for Summary Judgment (ECF No. 20) in response to the above-captioned civil rights complaint.  Plaintiff opposes the motion.  ECF No. 23.  The court finds a hearing in this matter unnecessary at this time.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons stated below, Defendants' motion will be denied in part and granted in part.

### Background

Plaintiff Albert M. Carter, an inmate committed to the custody of the Maryland Division of Correction and confined at Western Correctional Institution in Cumberland, Maryland, claims he was assaulted by Defendants who are correctional officers.  Carter adopts the description of events as written in an Administrative Remedy Procedure complaint (ARP) dated December 18, 2015, as the basis for his claims in this court.  ECF No. 1 at p. 3.

Carter states that on December 17, 2015, at approximately 11:27 a.m. to 11:50 a.m., he had a "dispute" with another inmate.  ECF No. 1-2 at p. 1.  This dispute occurred while Carter was confined to his cell in Housing Unit 4 on A tier and involved Carter throwing what he

claimed was water on an inmate who was working on the tier. *Id*. Carter claims that after he threw the water on the other inmate, Officer Durst pepper-sprayed Carter and his cellmate, Jordon Rich. *Id*. Carter states that he and Rich were then handcuffed and taken out of the cell. ECF No. 1- 2 at p. 1. While walking down the tier handcuffed, the inmate whom Carter had earlier assaulted, walked up to him and punched him in the face. *Id*.

Carter claims that he was then taken into a back room where his "mouth was rammed into a wall twice" and his tooth was broken. ECF No. 1-2 at p. 2. He claims that Officers Durst and Wilson placed him in "the seg. cage" and allowed the same inmate who punched him to come into the cage and attack him. *Id*. He further claims that Wilson punched him twice and that he was called derogatory names. *Id*. Carter also states that Wilson told him that he should be hung. *Id*.

As relief, Carter seeks $350,000 in damages for the officers breaking his tooth and allowing another inmate to assault him while he was handcuffed. ECF No. 1 at p. 3. He further seeks a transfer from the Cumberland, Maryland region and repair to his tooth. *Id*.

Defendants provided verified records and their sworn statements in support of the dispositive motion. ECF No. 20. Carter, Rich, and James Isbell, the inmate who punched Carter as he was being escorted off the tier, were each issued a Notice of Infraction as a result of the December 17, 2015 incident. *Id*. at Ex. 5 – 7. Carter was charged with violation of Rules 102 (assault or battery on an inmate) and 400 (disobey an order). *Id*. at Ex. 5, p. 5. Officer Durst wrote the Notice of Infraction, which in relevant part states:

> At approximately 1127 Hours, I was collecting feed up trays from the rear of lower A wing when I observed Maximum Security Disciplinary Segregation Inmate Carter . . . squirt an unknown liquid substance from the pass through slot of cell 4A-16, striking Medium Security General Population Inmate [James] Isbell . . . who was working feed up on A wing in the upper chest and facial area. I immediately responded to cell 4A-16 and ordered Inmate Carter

> to put down the plastic container.  Inmate Carter refused my orders and shoved the container towards the pass through slot, at which time I applied a quick burst of pepper spray to the facial area of Inmate Carter to stop his attempted assaults.  After Inmate Carter dropped the plastic container, he was placed in hand restraints along with his cell partner . . . Jordan Rich . . . by responding Officer D. Frenzel COII.  I called for cell 4A-16 to be opened at which time myself (sic) and Officer Frenzel started to escort Carter and Rich off of A wing.  While escorting Inmate Carter, Inmate Isbell came back onto A wing and struck Inmate Carter in the facial area with a closed fist.  Responding Officer R. Raines COII took over the escort of Inmate Rich while Officer Frenzel assisted me with the escort of Inmate Carter.  Officer G. Wilson COII responded to the lower A wing recreation hall and placed hand restraints on the wrists of Inmate Isbell.  Inmates Carter, Rich and Isbell were all escorted off of A wing to await the arrival of medical staff.  Inmates Carter and Rich were photographed and treated by Brenda Reese, R.N. for exposure to pepper spray.  Inmate Isbell was photographed and treated by Brenda Reese, R.N. for exposure to an unknown liquid substance.  All three inmates completed an Inmate Statement and were given a shower for decontamination.

ECF No. 20 at Ex. 5, p. 5.  Pursuant to a plea agreement, Carter pled guilty to violating both rules and received 90 days of segregation and 120 days of good conduct credits revoked.  *Id*. at p. 9.  Carter appealed the hearing results to the warden alleging he was improperly denied a postponement so that his requested representative could attend the hearing.  *Id*. at p. 13.  He further claimed that the actions taken by the officers evidenced a bias against him based on his race.  *Id*. at p. 14.  Carter argued that he was pepper-sprayed for assaulting Isbell, who is white, but Isbell was not subjected to any use of force following his assault on Carter, who is black.  *Id*.  The correctional officers involved were all white.  *See* ECF No. 20 at Ex. 2 (video recording).  Carter requested the warden reduce his penalty or schedule a new hearing.  *Id*. at Ex. 5, p. 14.  The warden affirmed the decision of the hearing officer.  *Id*. at p. 2.

Carter's cellmate, Jordan Rich, was given a Notice of Infraction for violating Rules 100 (engaging in a disruptive act) and 312 (interfering or resisting the performance of staff duties).  ECF No. 20 at Ex. 6, p. 5.  Officer Raines alleged that Rich pulled away from his escort in an

attempt to "get at Inmate Isbell." *Id.* Rich pled guilty to violating Rule 312 and the other charge was dismissed per an agreement he reached with the State representative. *Id.* at p. 8.

James Isbell was charged with violating Rule 102 for his assault on Carter. ECF No. 20 at Ex. 7, p. 12. After a hearing, Isbell was found guilty of the violation and sanctioned with 90 days of segregation and 120 days lost good conduct credit. *Id.* at pp. 16 – 18. Isbell maintained that he acted in self-defense. *Id.* at p. 16. He explained in an appeal to the warden that the liquid Carter squirted in his face, which got into his eye, smelled of bleach and urine and caused burning in his eye as well as blurry vision. *Id.* at pp. 7 – 10. Isbell stated that Carter also tried to assault Durst with the same liquid, requiring Durst to pepper spray Carter. *Id.* He first left the tier to rinse the substance from his eye and returned to finish working. *Id.* He claimed that when he was walking back down the tier he heard someone say, "spit on that bitch," followed by the sound of Carter getting ready to spit on him. *Id.* Isbell alleged he punched Carter to keep him from assaulting him again and expressed concern that exposure to bodily fluids would reinfect him with Hepatitis C. *Id.* Isbell's sanction was reduced to 30 days of segregation and no lost good conduct credit. *Id.* at p. 1.

A Use of Force Report was prepared and concluded that Durst's use of pepper spray on Carter was justified in light of his refusal to drop the plastic container of liquid and his aggressive movement of the container toward Durst. ECF No. 20 at Ex. 1. It was, however, determined by Captain Marc Whiteside and Chief of Security Bradley Butler that Isbell should have been secured off of the tier before Carter and Rich were removed from the cell in restraints. *Id.* at p. 2, *see also id.* at p. 3 (Asst. Warden Galsinger and Warden Richard Graham concurring). Other aspects of Carter's claims that force was used against him were not addressed in this report. Carter provided a written statement for purposes of the Use of Force Report which states:

"When I threw stuff on the worker I was spraid (sic) they opened the door and I was assaulted by the inmate worker." *Id.* at p. 18.  Carter's statement was provided at 12:35 p.m. on December 17, 2015.  *Id.*, *see also* Ex. 8, p. 11 (IID investigation report noting the time of Carter's statement and the absence of an allegation of a second assault).

Carter's claims were investigated on December 21, 2015, by Detective Mills of the Internal Investigation Division (IID).  A verified copy of that report is submitted by Defendants in support of their motion.  ECF No. 20 at Ex. 8.  Carter's injuries which were treated by medical staff were noted as:  "chipped tooth, swollen face and right eye, and a blood clot in the right eye."  *Id.* at p. 3.  Mills interviewed Carter who told Mills that "the incident took place in the property room where he was pepper sprayed, beaten by the officers as well as another inmate." *Id.* at p. 9.  He further told Mills that he and Isbell "had problems" so when Isbell came to his door, he squirted Isbell "with a bottle containing disinfectant."  *Id.* at p. 12.  Carter further claimed that Durst saw him assault Isbell and that he pepper sprayed him without first giving him any orders.  *Id.*

Carter further told Mills that while he was on the tier, he was punched in the left side of his face.  *Id.*  Carter stated that he had pepper spray in his eyes and could not see who had punched him so he began kicking to protect himself.  *Id.*  Carter told Mills that two officers were escorting him, but he did not know who they were.  *Id.*  He claimed that the two officers escorting him "ran his face and mouth into the doorway and  . . . then took him back to the strip cage where they again ran him into the door, causing his left tooth to chip."  *Id.*

Carter further related to Mills that "while in the cage, someone began to hit him in his ribs" two or three times and that he could not identify the officers who did this.  *Id.*  Carter claimed that one of the officers threatened to break his arm and that once he was locked into the

Case 8:16-cv-00103-DKC   Document 24   Filed 12/30/16   Page 6 of 17

cage, the officers "sprayed him several more times with pepper spray." *Id*. Once the officers stopped spraying pepper spray, Carter claimed that he was able to wipe his eyes and see Durst and Wilson unlock the cage and allow Isbell to come into the cage to assault Carter a second time. *Id*. He claimed that Isbell punched him in his face, shoulder blade, and back. *Id*. Carter told Mills that he tried to run out of the cage to get away from Isbell, but Wilson punched him in the right cheek. *Id*. Carter claimed that the officers allowed Isbell to leave following the assault. *Id*. Carter told Mills he did not wish to press criminal charges against Durst, Wilson, or Isbell, but stated "they shouldn't have allowed [Isbell] to come back on the tier to assault him." *Id*.

Mills' interview of Jordan Rich revealed some discrepancies in Carter's account of what occurred on December 17, 2015. Rich explained that he was the first one out of the cell following Durst applying pepper spray to Carter and that Rich did not have any pepper spray in his eyes. ECF No. 20 at Ex. 8, p. 13. Rich recalled that while he was being escorted down the tier by Officer Frenzell, he heard a "pop" sound from behind him and heard Carter yelling. *Id*. When Rich turned around he saw Carter kicking. *Id*. Rich further told Mills that he was escorted to "the library" and that Durst ran Carter into a doorway. *Id*. When Carter walked by Rich he told Rich "they broke my tooth." *Id*. Rich's recollection that Carter's reported his tooth was broken before reaching the strip cage contradicted Carter's claim to Mills that his tooth was broken during the alleged second assault. *Id*. Rich further recalled that the officers "took Carter somewhere in the back" and that he heard the officers "tussling and hitting and spraying him," confirming Carter's claim that there was a second assault. *Id*. Rich claimed Carter and the officers "were back there about 10 – 15 minutes tussling and spraying him the entire time." *Id*. Rich stated he could discern what was going on because he could hear and he could smell the

spray.  *Id*.  When asked about Carter's injuries, Rich told Mills that "when they brought him out, he saw an abrasion on his right shoulder and the right side of his face."  *Id*.

Rich further told Mills that he saw where the officers took Isbell and recalled he was placed "in the little room across from the library and control center."  *Id*.  Rich stated that he did not see the officer take Isbell from that room during the time Carter was in the back and said "[n]o, he was in there the entire time that I saw," contradicting Carter's claim that Isbell was allowed to assault him again.  *Id*.  Rich further related that when he was escorted out of the library, "he walked by and saw that [Isbell] was still in there and was putting his shirt on."  *Id*.

Mills interviewed Isbell who admitted to hitting Carter as the officers were escorting him off the tier.  ECF No. 20 at Ex. 8, p. 14.  Isbell stated that he was working as a special utility worker on the tier when Carter asked him to pass something to another inmate and when Isbell declined to do so, Carter cussed him out.  *Id*.  Isbell further explained that when he was picking up lunch trays, Carter called him over to his door and squirted a substance that smelled like bleach and urine on his face and back, causing his eyes and skin to burn.  *Id*.  Isbell immediately went to the rec hall to wash his face.  *Id*.  When he returned, he approached Carter and "clocked him one."  *Id*.  Isbell confirmed Rich's account that he was placed "in the little room across from the control center" after he was handcuffed by officers and stated he was there for about 30 minutes.  *Id*.  He denied that he went into the strip cage to assault Carter and denied seeing any officers assault Carter.  *Id*.

Mills interviewed Durst on January 26, 2016.  Durst confirmed that he and Frenzel escorted Carter to the strip cage in the back and denied running Carter's face into the doorway during the escort.  ECF No. 20 at Ex. 8, p. 15.  Durst stated that when Carter was placed in the cage and the door was locked, Carter was still kicking because "he still couldn't see."  *Id*.  When

asked what occurred after the cage door was locked, Durst said Carter was uncuffed and that they strip searched him. *Id.* Durst further told Mills that "they gave Carter a wet rag to wash his face and then he (Durst) returned to the control center to wash his eyes out." *Id.* at p. 16. Durst denied assaulting Carter and denied allowing Isbell into the strip cage to assault Carter. *Id.* He told Mills that he and Frenzel were the only two officers in the strip cage area with Carter. *Id.*

In his declaration under oath prepared for this case, Durst states that he did not participate in strip searching Carter, nor did he witness any other person conduct a strip search. ECF No. 20 at Ex. 9, p. 2, ¶ 4. Further, Durst maintains in his declaration that he went back to the housing unit control center because he had been exposed to pepper spray. *Id.* He also states that Carter was escorted off the tier without further incident. *Id.* at pp. 1 – 2, ¶ 3. Durst explains why he did not deploy pepper spray when Isbell punched Carter in his declaration:

> Due to incident occurring spontaneously, I was unable to apply pepper spray to Mr. Isbell; however, immediately after he struck Mr. Carter he proceeded to walk away from us and into the A-wing recreation room where he was no longer posing a threat to Mr. Carter or staff. Additionally, after Mr. Isbell struck Mr. Carter, Mr. Carter began to kick and attempt to pull away from me which required my sole focus to be maintain (sic) control of his escort. Ofc. Frenzel then had Ofc. R. Raines take over his escort of Mr. Rich and assisted me with escorting [Carter] off of the wing without further incident.

*Id.* Durst states in his declaration and also informed Mills during his interview, that he has been employed as a correctional officer for 7 years and this incident was the first time he has had to use pepper spray. *Id.* at p. 2, ¶ 5 (erroneously marked "4").

Mills interviewed Officer Frenzel on January 29, 2016. ECF No. 20 at Ex. 8, p. 19. He told Mills that when Durst told him he had just pepper sprayed Carter, he came down from the top tier of the housing unit and handcuffed both Carter and Rich and called for the cell door to be opened. *Id.* Frenzel was escorting Rich down the tier at first, but when he "heard a commotion behind him" and turned to see Carter kicking, he handed Rich off to Officer Raines, who had

8

Case 8:16-cv-00103-DKC   Document 24   Filed 12/30/16   Page 9 of 17

also been escorting Rich.  Frenzel claimed he did not see Isbell on the tier and said that both he and Durst were having a hard time seeing because of the pepper spray.  *Id*.  Frenzel said that when he saw Carter kicking he thought that Carter "was bucking on Durst so he went to help.  *Id*. Frenzel related that he asked Carter why he was swinging on an officer and Carter replied, 'why you swinging on me.'  *Id*.  Frenzel admitted he did not know what was going on.  *Id*.

Frenzel told Mills that there were three officers present at the strip cage where Carter was taken – Durst, S. Wilson, and himself.  *Id*.  He stated that some of Carter's clothes were given back to him and Carter was told they were waiting on medical staff to come.  *Id*.  Frenzel claimed he did not stay in the area of the strip cage the entire time; rather, he returned to the tier to complete feed-up.  *Id*.  He denied running Carter into a doorway, denied assaulting Carter in the strip cage, denied allowing Isbell into the strip cage to assault Carter, and denied seeing Durst or Wilson assault Carter.  *Id*.  Frenzel further denied calling Carter derogatory names or hearing other officers do so.  *Id*. at p. 20.  In his declaration under oath prepared for the instant case, Frenzel states he did not strip search Carter and does not recall witnessing any other staff perform a strip search.  ECF No. 20 at Ex. 10, p. 1, ¶ 3.

Officer Steven Wilson was interviewed by Mills on January 26, 2016.  ECF No. 20 at Ex. 8, p. 17.  Wilson stated that he was in the "adjustment room" when officers responded to the tier following Carter being pepper sprayed and "he never even made it on the tier."  *Id*.  Wilson recalled that he saw Carter being escorted to the strip cage and could see he had been pepper sprayed.  *Id*.  He further recalled that there was pepper spray in the air and it was bothering him. *Id*.  Wilson said he saw Carter in the strip cage and that Carter was crying because of the spray in his eyes.  *Id*. at p. 18.  Wilson claimed he was not present when Carter was strip searched, but denied that Carter was pepper sprayed again while he was in the strip cage.  *Id*.  Wilson further

denied seeing Isbell come back to the strip cage to assault Carter, denied assaulting Carter or seeing others do so, and denied seeing Carter being run into a doorway during the escort.  *Id.*  Wilson's declaration under oath states:  "After observing Mr. Carter being placed into the strip cage I returned back into the adjustment room due to my assistance not being needed and the pepper spray bothering me."  ECF No. 20 at Ex. 14, p. 1, ¶ 2.

A medical record documenting Carter's treatment for pepper spray by Brenda Reese, RN, indicates he was seen at 12:17.  ECF No. 20 at Ex. 3, p. 2.  Reese assessed Carter for injuries and noted them as follows:  "left eyebrow abrasion, left facial cheek abrasion, right cheek abrasion, right shoulder abrasion and left scapula abrasion."  *Id.*  Reese further notes that there was "[n]o active bleeding to any of the areas" and that Carter did not seek medical treatment for the injuries.  *Id.*  She states that Carter was sent for a shower for pepper spray exposure.  *Id.*

On December 22, 2015, Carter was seen by S. Weber of the psychology department following his "multiple written self-referrals."  ECF No. 20 at Ex. 3, p. 4.  Weber noted that Carter did not present with a mental health issue or concern; rather, he "spent the interview complaining about the recent use of force on the tier."  During the interview Carter claimed that staff assaulted him by "'running my face into the wall and breaking my tooth.'"  *Id.*  Weber consulted with Housing Unit Manager Lt. Smith and "began a dialogue with Inmate Carter about the order of events and the responsibilities of interest[ed] parties."  *Id.*  Weber notes that Carter became agitated and hostile when those questions were asked.  *Id.*  Carter stood up and left the interview and Weber reports that the escorting officer later told him that Carter told other inmates on the tier that Weber is "a piece of shit."  *Id.*

A summary of Carter's dental record indicates he was seen by Colin Williams, DDS on December 24, 2015, in response to a sick call slip stating, "how can I get a copy of my dental

records." ECF No. 20 at Ex. 4, p. 5.  In a note also dated December 24, 2015, Carter is described as cooperative and that he consents to treatment.  *Id*.  Dr. Williams notes that "trauma [is] absent."  *Id*.  In a summary note dated March 25, 2016, written by Thomas Blaik, DDS, it is noted that Carter has two fractured teeth.  *Id*. at pp. 6 – 7.  Defendants do not provide a declaration under oath from either dentist with their motion.

Defendant Ronald Raines states in his declaration under oath that he escorted Rich to room 419 to receive medical attention following the incident.  ECF No. 20 at Ex. 14, p. 1.  After taking Rich to that room, Raines states he returned to the housing unit control center and was not further involved in the incident.  *Id*.

Defendants provide a declaration under oath from Officer Gerald Wilson, Jr., who is the officer who retrieved Isbell from the A-wing recreation room after Isbell punched Carter in the face.  ECF No. 20 at Ex. 12.  Gerald Wilson states that he handcuffed Isbell and escorted him to room 419 to await medical attention.  *Id*.  He explains that Isbell offered no resistance and followed the orders given, therefore there was no need for the use of pepper spray or other force. *Id*.  Gerald Wilson states he was not involved in the escort of Carter off the tier and was otherwise uninvolved in the incident.  *Id*.

## Standard of Review

### Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

<u>Eighth Amendment</u>

A.     Excessive Force

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986). The absence of significant injury alone

is not dispositive of a claim of excessive force.  *Wilkins v. Gaddy*, 559 U.S. 34 (2010).  The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm.  *Id*. at 38.

B.      Failure to Protect

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Plaintiff must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm.  *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987).  "Prison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penologicial objective, any more than it squares with evolving standards of decency.  Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."  *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations omitted).  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*. at 837, *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials."  *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016), citing *Farmer*, 511 U.S. at 832.  Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'"  *Id*.  "[N]ot every injury suffered by a prisoner at the hands of another

translates into constitutional liability for prison officials responsible for the victims safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor*, 817 F.3d at 127.

### Analysis

It is undisputed that Carter assaulted Isbell by squirting him with what has been described as disinfectant or bleach mixed with urine. It cannot be discerned from the surveillance video whether Durst gave Carter an order to drop the squirt bottle or whether Carter refused to follow that order as there is no audio accompanying the video. ECF No. 20 at Ex. 2. Carter's complaint is unverified (ECF No. 1) and his opposition response (ECF No. 23) does not include an affidavit refuting Durst's account that Carter refused an order to drop the weapon he used. In addition, there is no allegation made by Carter that he was not still holding the weapon when Durst approached. Indeed, there is evidence to the contrary as indicated by Carter's guilty plea to refusing to obey an order. Thus, Durst's use of force by spraying pepper spray on Carter after he assaulted Isbell was justified and does not state an Eighth Amendment claim.

With respect to Isbell's assault on Carter while he was being escorted off the tier, the circumstances leading up to the assault appear to have been occasioned by the perceived exigency of removing Carter and his cellmate from the cell that was then full of pepper spray. While the conclusion on the Use of Force Report indicates that Isbell should have been secured off the tier prior to Carter and Rich being removed from the cell, the officers involved consistently state that Isbell was not present at the time Carter and Rich were removed. In addition, Durst consistently claimed that he could not see well due to the effects of the pepper spray and other officers in the area also indicated they were adversely affected. The decision to

remove Carter and Rich before taking steps to insure Isbell could not return is the sort of decision that is protected from liability by the defense of qualified immunity.

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "In particular, . . . qualified immunity protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines.'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). The defense provides protection for public officials for mistakes of law, mistakes of fact, or a combination of the two. *See Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting). Qualified immunity is a defense from suit, not simply liability, which is lost if a matter is improperly permitted to go to trial. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Resolution of whether an official is entitled to qualified immunity must be determined "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

In order to determine if a public official is entitled to the protections afforded by qualified immunity, two inquiries must be addressed by this Court. Although the Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001) directed a rigid approach to the inquiries involved, the requirement that the two-prong analysis must be "considered in proper sequence" has since been revised. *Katz*, 533 U.S. at 200. Courts are now "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed  first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 818.

The first prong is whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201.  If the evidence establishes a violation of a constitutional right, the second prong is to assess whether the right was "clearly established" at the time of the events at issue.  *Id.*  If the right was not clearly established, the qualified immunity doctrine shields a defendant officer from liability.  The "answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds."  *Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007) (citing *Batten v. Gomez*, 324 F.3d 288, 293-94 (4th Cir. 2003)).

Under the circumstances as they existed, Defendants' decision to remove Carter and Rich from their cell without first insuring Isbell had no access to the tier, was a bad guess that Isbell would not return for vengeance.  At best, Defendants were negligent in making that decision and did not intentionally expose Carter to an unreasonable, known risk of harm.

Finally, Carter's claim that he was assaulted by Defendants during the escort and following his placement in the strip cage must go forward.  By their admission, the Defendants who were present when Carter was placed in the strip cage were Durst, Frenzel, and S. Wilson; and Defendants Durst and Frenzel were the officers who escorted Carter.  Carter's injuries remain unexplained by the admitted assault by Isbell which consisted of a single punch to his face.  Defendants have documented that Carter also suffered abrasions to both sides of his face and to his shoulder.  There is conflicting evidence presented by Defendants regarding whether Carter also suffered a broken tooth.  On the record before this court, there is no plausible explanation for those admitted injuries.  Thus, there is a genuine dispute of material fact presented in Defendants' own evidence which forecloses summary judgment in their favor

regarding this assault.  Determination of whether the assault occurred requires a determination of the credibility of the parties which is not permitted on summary judgment.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) ("Credibility determinations . . . are jury functions, not those of a judge").  Moreover, Defendants cannot claim entitlement to qualified immunity where, as here, there is nothing offered as a legitimate reason for the force alleged.  Defendants have not demonstrated that summary judgment is appropriate on this aspect of the claim and their motion as it applies to the alleged assault by Durst, Frenzel, and Wilson during Carter's escort and while he was confined to the strip cage shall be denied.  The summary judgment shall be granted as to the remaining claims and the claims against Defendant Raines.

A separate Order follows.


December 30, 2016                                _____/s/_____
                                                DEBORAH K. CHASANOW
                                                United States District Judge